IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANITA ZASKODA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL NO. H-05-2444 |
| | § | |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

<u>**MEMORANDUM OPINION**</u>

Pending before the court[1] are Defendant's Motion for Summary Judgment (Docket Entry No. 14), Plaintiff's Motion to Review or Consolidate (Docket Entry No. 17), and Plaintiff's Motion for Summary Judgment (Docket Entry No. 18).  The court has considered the motions, all relevant filings, and the applicable law.  The court has reviewed the entire case history.  Plaintiff's Motion to Review or Consolidate is **GRANTED** with regard to the request for review, but **DENIED** with regard to the request for consolidation.  For the reasons set forth below, the court **DENIES** Defendant's summary judgment motion and **GRANTS** Plaintiff's summary judgment motion.

**I.  Case Background**

**A.  <u>Procedural History</u>**

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for

---

[1]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 9-11.

judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner") regarding Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("the Act").

Plaintiff filed for disability benefits on December 18, 1997, claiming an inability to work since July 1, 1991, due to left hip pain, poor circulation, and swelling in the left leg and foot.[2] Plaintiff's disability insured status expired as of December 31, 1993.[3]  The Commissioner denied Plaintiff's application at the initial and reconsideration levels of review for failure to establish a disabling condition prior to December 31, 1993, when she was last insured for disability benefits.[4]  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[5]  The ALJ granted Plaintiff's request and conducted a hearing in College Station,[6] Texas, on November 20, 1999.[7]

On January 4, 2000, the ALJ found that Plaintiff was not disabled at any time through the date of the decision because she

---

[2]    Transcript of the Administrative Proceedings ("Tr.") 71, 80.

[3]    Tr. 17, 58, 63.

[4]    Tr. 52-63.

[5]    Tr. 64-65.

[6]    The transcript indicates that the hearing took place in Houston, but the ALJ's opinion and the hearing notice state that it occurred in College Station.  Compare Tr. 25 with Tr. 17, 66.  The discrepancy has no bearing on the court's opinion.

[7]    Tr. 17, 25-51, 66.

was capable of performing her past relevant work.[8]  In May 2002, the Appeals council approved the ALJ's decision.[9]  Plaintiff appealed the final decision to the federal district court, which granted Defendant's unopposed Motion to Reverse and Remand for the stated purpose of reevaluating Plaintiff's residual functional capacity ("RFC") particularly in light of Plaintiff's medication side effects.[10]  Pursuant to the court's order, the Appeals Council remanded the case to the same ALJ to reevaluate Plaintiff's RFC and, in connection with that, to evaluate her "complaints of suffering side effects from her medication."[11]

The ALJ held the second hearing on November 4, 2003, in College Station.[12] On February 10, 2004, the ALJ issued his second decision finding that Plaintiff was not disabled as of or prior to December 31, 1993, because she was able to perform her past relevant work.[13]  Ten months later, the Appeals Council denied her request for review of the ALJ's decision and, thus, affirmed it as the final decision of the Commissioner.[14]  Plaintiff requested, and

---

[8]     Tr. 20-21.

[9]     Tr. 7.

[10]    Tr. 551-52.

[11]    Tr. 556.

[12]    Tr. 563, 779-801.  Again, the transcript indicates that the hearing took place in Houston, but it appears that it actually occurred in College Station.

[13]    Tr. 547.

[14]    Tr. 520-22.

3

the Appeals Council granted, additional time for her to seek judicial review of the decision.[15] She filed her complaint on July 14, 2005.[16]

## B.  <u>Factual History</u>

Plaintiff was born on April 1, 1942, and was forty-nine years old on the date of the alleged onset of disability.[17] Plaintiff graduated from high school and received some on-the-job training.[18] Prior to the alleged onset of her disability, Plaintiff was employed as an accounting clerk, an office clerk, and a grocery cashier.[19] She also performed child-care and housecleaning services, but not at the level of substantial gainful activity.[20]

Plaintiff's medical record reflects that she began experiencing consistent pain in her left hip about August 1993.[21] Prior to that time, she was not taking regular medications of any sort.[22] In August 1993, she reported to her primary care physician at Four Oaks Medical Clinic ("Four Oaks") in Columbus, Texas, that, on and off in the past, she had experienced pain in her left hip,

---

[15]     Tr. 518-19.

[16]     <u>See</u> Docket Entry No. 1.

[17]     Tr. 71.

[18]     Tr. 28, 29, 84.

[19]     <u>See</u> Tr. 29-35, 49-50, 84, 88.

[20]     <u>See</u> Tr. 50, 84, 88.

[21]     <u>See</u> Tr. 196; <u>see also</u> Tr. 36-37.

[22]     Tr. 232.

4

which resolved with the use of an anti-inflammatory medication, Feldene.[23]   In a progress note, J.L. McEvers, P.A.C., ("Dr. McEvers") wrote:

> She has had it for approximately two weeks this time, it began to bother her when she was out working in the yard. And then she stepped in a hole while she was walking across the fence.  And I think she may have aggravated it.  She has no past [history] of trauma, nor other past [history] of workup for other arthridities.  She says the pain in it does not wake her up at night.  It feels pretty good in the [morning], and gets worse as the day goes on.  Generally responds well to rest, heat and anti-inflammatories as previously mentioned.[24]

On that day, Dr. McEvers' examination revealed pain and tenderness in the left hip joint, decreased range of motion with particular discomfort with flexion and abduction.[25]  Plaintiff was unable to cross her left leg.[26]  X-ray films showed degenerative changes and early arthritis.[27]   Dr. McEvers prescribed Darvocet, a pain reliever, in addition to Feldene.[28]

About two weeks later, Plaintiff was seen again for hip pain at Four Oaks, this time by K.L. Anderson, M.D., ("Dr. Anderson").[29] Although Plaintiff reported that the pain continued, the doctor

---

[23]   Tr. 196.

[24]   Id.

[25]   Id.

[26]   Id.

[27]   Id.; see also Tr. 163.

[28]   Tr. 196.

[29]   Tr. 195.

observed increased mobility in her hip.[30]  Dr. Anderson prescribed a different anti-inflammatory medication, Lodine, instead of Feldene.[31]  A bone scan revealed "some arthritic early aseptic necrosis changes of the upper outer acetabular area," but was otherwise normal.[32]  Dr. Anderson referred Plaintiff to Timothy Spires, M.D., ("Dr. Spires").[33]

Dr. Spires saw Plaintiff on August 19, 1993.[34]  As she had reported to the doctors at Four Oaks, Plaintiff told Dr. Spires that she began experiencing hip discomfort approximately three weeks prior to the appointment and that the pain was getting progressively worse.[35]  She also told him that she occasionally experienced pain in her left knee, but reported no swelling.[36]  Upon examination of Plaintiff and review of the prior x-rays and bone scan, Dr. Spires diagnosed Plaintiff with degenerative joint disease in her left hip "with cyst in the acetabulum."[37]  He recommended that Plaintiff continue taking Lodine and use

---

[30]   Id.

[31]   Id.

[32]   Tr. 162.

[33]   Tr. 195.

[34]   Tr. 245.

[35]   Id.

[36]   Id.

[37]   Id.

crutches.[38]   On August 26, 1993, Plaintiff followed up with Dr. Spires and reported that her pain returned after three or four days and that she had not been using an ambulation device.[39]   The exam showed continued limitation in her range of motion and continued discomfort.[40]   Dr. Spires provided Plaintiff with samples of the anti-inflammatory medication Tolectin to replace Lodine and ordered additional diagnostic tests.[41]   He encouraged her to use her walker as long as she was experiencing pain.[42]

She returned to see Dr. Anderson on September 3, 1993, at which time she shared the results of her visits to Dr. Spires.[43] Because Plaintiff reported experiencing persistent symptoms while on Lodine, Dr. Anderson prescribed Tolectin.[44]   He noted that Plaintiff was not using her walker.[45]   An October chart note indicates that Plaintiff was experiencing pain in her feet and that Dr. Anderson suggested the use of orthotic shoes.[46]   According to the notes, Plaintiff refilled her Darvocet prescription three times

---

[38]     Id.

[39]     Id.

[40]     Id.

[41]     Id.

[42]     Id.

[43]     Tr. 194-95.

[44]     Tr. 194

[45]     Id.

[46]     Id.

before the end of the year.[47]

At an appointment with Dr. Spires on September 24, 1993, Plaintiff stated that she was experiencing less pain, but felt as if her hip was "slipping."[48]  The progress note indicates that, at that time, she was taking the anti-inflammatory medication Daypro.[49] Dr. Spires recommended magnetic resonance imaging ("MRI") because of Plaintiff's limited range of motion.[50]

The MRI from September 30, 1993, disclosed osteoarthritic changes in the left hip with small joint effusion, but no aseptic necrosis.[51]  The radiologist who reviewed the images specifically noted joint space narrowing, subchondral sclerosis, and acetabular cyst formation, but no destructive lesion, fracture, or soft tissue mass.[52]  Upon review of the MRI reports, Dr. Spires chose to continue treatment with anti-inflammatory drugs and gave Plaintiff samples of another such medication, Relafen.[53][54]

A note from October 22, 1993, mentions that Plaintiff was

---

[47]   Id.

[48]   Tr. 244.

[49]   Id.

[50]   Id.

[51]   Tr. 122.

[52]   Id.

[53]   Tr. 244.

[54]   Tr. 241.

reporting night pain.[55]  Because Plaintiff was experiencing minimal relief from Relafen, Dr. Spires switched Plaintiff's anti-inflammatory medication again, to Orudis.[56]  By December 1993, Plaintiff's pain had decreased with chiropractic treatment and the anti-inflammatory drug Ansaid.[57]  Dr. Spires referred Plaintiff to physical therapy.[58]  Plaintiff cancelled the next two appointments with Dr. Spires.[59]  In February 1994, Plaintiff reappeared at Dr. Spires' office reporting discomfort and night pain.[60]  She was taking Motrin, another anti-inflammatory medication.[61]  Dr. Spires evaluated Plaintiff's range of motion and reviewed x-rays from another facility.[62] He recommended total joint arthroplasty because her condition resisted the lesser treatments of anti-inflammatory medication and assistive devices.[63]

In March 1994, Plaintiff underwent a total hip replacement.[64] According to Dr. Spires, Plaintiff's postoperative course was

---

[55]   Tr. 244.

[56]   Id.

[57]   Id.

[58]   Id.

[59]   Id.

[60]   Id.

[61]   Id.

[62]   Id.

[63]   Id.

[64]   Tr. 141, 240.

uneventful.[65]   In the months that followed, exams revealed good results from the surgery, including decreased pain and increased range of motion.[66]   Two years after surgery, her pain was controllable and her range of motion was good, although she continued to limp.[67]

Plaintiff filed for benefits almost four years after her surgery and a full four years after she was eligible for disability insurance benefits.   At the time of her application, Plaintiff reported that she was experiencing pain in her left hip and pain with swelling in her left leg and foot.[68]   The pain caused her to limp badly.[69]   She identified her hip, along with circulatory problems, as the disabling conditions.[70]   In her description of how they prevented her from working, she stated that her whole leg hurt significantly day and night and that she needed to elevate her legs often.[71]   According to her Disability Report, her pain medication sometimes caused her to be drowsy and numbed her senses.[72]   She indicated that she no longer could dance, could not walk very far

---

[65]    Tr. 240.

[66]    See Tr. 160, 193, 243.

[67]    See Tr. 240, 242.

[68]    Tr. 80.

[69]    Tr. 95.

[70]    Tr. 80.

[71]    Tr. 80, 83, 95.

[72]    Tr. 80, 96.

without her cane and did not drive very often.[73]  Her family helped
with cooking, cleaning, and shopping.[74]   She also required
assistance to turn in bed, to get out of bed, to get up from the
toilet or a chair, and occasionally to dress.[75]

At the first hearing, Plaintiff stated that she could not work
"[b]ecause I have a lot of trouble with my leg right now."[76]
Although she told the ALJ that she first had trouble with her leg
as early as 1988, she also said that she did not seek treatment
until late 1993.[77]  She testified that, in 1993, she was unable to
walk more than twenty or thirty feet, could sit for only fifteen or
twenty minutes at a time, and could not get into a car without
significant pain.[78]  Plaintiff explained that her pain continued
after surgery in 1994.[79]  Plaintiff's niece also testified and
shared her observations with regard to Plaintiff's pain and
difficulty ambulating.[80]  Neither Plaintiff nor her niece mentioned
that Plaintiff suffered side effects from her medication.[81]

---

[73]    Tr. 83.

[74]    Id.

[75]    Tr. 86, 96.

[76]    Tr. 36.

[77]    Tr. 36-37.

[78]    Tr. 37-38.

[79]    Tr. 41.

[80]    Tr. 43-45.

[81]    Tr. 36-45.

The record contains an RFC Assessment form from February 1998.[82] Upon review of the medical record, the consulting physician opined that Plaintiff occasionally could lift twenty pounds, frequently could lift ten pounds, could stand and/or walk for about six hours of an eight-hour day, and could sit for about six hours of an eight-hour day.[83]   The consulting physician recognized limitations in Plaintiff's ability to push and/or pull with her lower extremities and in her ability to climb, to balance, to stoop, to kneel, to crouch, and to crawl.[84]   At the hearing, the testifying medical expert stated:

> And I looked through the records to see if I could find an entry as to how long and how severe left hip symptoms have been present prior to March of [19]94 surgery and I found no actual, I found no accurate description but at least knowing as to what was occurring in orthopedic surgery and with my patients who were complaining and being readied for hip replacement at that time, that a person would have been symptomatic for at least twelve months.[85]

He continued by opining that, as of March 1993, Plaintiff likely was limited to a less-than-full range of sedentary-level work activities, "that is lifting five pounds frequently and . . . up to ten pounds upon occasion, could be on [her] feet for a total of three hours in an eight hour period of time, occasional bending and

---

82    Tr. 180-87.

83    Tr. 181.

84    Tr. 181-82.

85    Tr. 46.

12

stooping but no crawling."[86]  The medical expert added that such a person would have been on pain medications that could have affected the central nervous system, limiting the ability to follow complex job instructions.[87]  Even so, Plaintiff's impairments would not have met any medical listing in the regulations (the "Listings"),[88] the medical expert explained, giving particular attention to the listing for osteoarthritis of a weight-bearing joint.[89]

The vocational expert testified that Plaintiff's past work as an accounting clerk was a semiskilled occupation customarily performed at a sedentary exertional level; her work as a general office clerk was classified as semiskilled and light; and her work as a grocery cashier also was classified as semiskilled and light.[90] The ALJ presented no hypothetical questions to the vocational expert.[91]

At the second hearing, Plaintiff recapped her testimony from the first hearing.[92]  Plaintiff added that, in 1993, she had to lie down at least a couple of times a day and often sat in a recliner

---

[86]    Tr. 47.

[87]    Id.

[88]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[89]    Tr. 47.

[90]    Tr. 49-50.

[91]    See id.

[92]    See Tr. 786-87, 789-91.

with her feet elevated.[93]  She elaborated on her pain medications and their side effects.[94]  Concerning side effects, Plaintiff claimed that they caused drowsiness and nausea.[95]  She also testified that the medications made her feel dizzy and less alert mentally.[96]  Plaintiff's daughter testified that she often helped Plaintiff clean the house, prepare meals, and grocery shop.[97]  The daughter also confirmed that the medications affected Plaintiff's mental abilities.[98]  Although a medical expert and a vocational expert attended the hearing, neither gave testimony.

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether:  1) substantial evidence in the record supports the decision; and 2) the ALJ applied proper legal standards in evaluating the evidence.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

## A.  Substantial Evidence

The widely accepted definition of "substantial evidence" is

---

[93]     Tr. 789-90, 796.

[94]     Tr. 791-93.

[95]     Tr. 791.

[96]     Tr. 793.

[97]     Tr. 792.

[98]     Tr. 798.

"that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion," <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." <u>Id.</u>  The Commissioner has the responsibility of deciding any conflict in the evidence. <u>Id.</u>  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown</u>, 192 F.3d at 496.  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

**B.   Legal Standard**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. §§ 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498. The Commissioner

can satisfy her burden either by reliance upon the Medical-Vocational Guidelines of the Regulations or by expert vocational testimony or other similar evidence. Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

### III.  Analysis

**A.  ALJ's Findings**

In his first decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant time period and that Plaintiff did have a combination of impairments (left hip replacement and degenerative arthritis) that was severe.[99] The ALJ found that Plaintiff's impairments, singly or in combination, did not meet or equal any of the Listings.[100] Plaintiff retained an RFC, according to the ALJ, to perform her past relevant work as an accounting clerk.[101]

In his second decision, the ALJ again found that Plaintiff had not engaged in substantial gainful work since the alleged onset

---

[99]    Tr. 17-18.

[100]    Tr. 18.

[101]    Tr. 19.

date.[102]  However, he differed from his first opinion with regard to
what impairments he found to be severe.  After the second hearing,
the ALJ identified degenerative joint disease of the left hip and
obesity as Plaintiff's severe impairments.[103]  The ALJ determined
that Plaintiff did not meet the requirements of either former
Listing 1.03 (in effect in 1993) for osteoarthritis of a weight-
bearing joint or the current Listing 1.02 for major dysfunction of
a joint.[104]  Additionally, the ALJ decided that Plaintiff's weight
neither met the 1993 Listing for obesity nor, under the current
regulations, equaled Listing severity when considered in
combination with her other impairments.[105]  The ALJ found that
Plaintiff was capable of "sedentary work involving limited bending
and squatting and allowing for the use of a cane for ambulation;
she was unable to crawl."[106]  Based on that RFC, the ALJ determined
that Plaintiff was capable of her past relevant work as an
accounting clerk and was not disabled as of or prior to December
31, 1993.[107]

Plaintiff requests judicial review of the ALJ's decision to

---

[102]   Tr. 539.

[103]   Id.

[104]   Tr. 539-40.

[105]   Tr. 540-41.

[106]   Tr. 547.

[107]   Id.

18

deny disability benefits.  Plaintiff contends that the ALJ's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.  Specifically, Plaintiff argues that: 1) substantial evidence does not support the finding that Plaintiff can perform her past relevant work as an accounting clerk; 2) the ALJ erred in rejecting the opinions of two treating physicians without appropriate rationale; 3) the ALJ failed to make a severity finding; 4) the ALJ failed to apply the proper legal standards in the assessment of Plaintiff's credibility; 4) the ALJ erred in failing to find Plaintiff disabled based on the medical-vocational guidelines[108] (the "Guidelines"); and 5) the ALJ did not follow the mandate of the district court.  Defendant, on the other hand, argues that the ALJ's decision is legally and factually correct with regard to Plaintiff's ability to perform her past relevant work through the date she was last insured, December 31, 1993.

Having reviewed the entire record, the court finds that the ALJ committed a serious error with regard to the vocational testimony.  The ALJ found Plaintiff not disabled at step four. Both decisions by the ALJ state that the vocational expert at the first hearing rendered an opinion on Plaintiff's ability to perform her past relevant work.  In his first decision, the ALJ wrote "Given the claimant's functional capacity, the vocational expert

---

[108]     20 C.F.R. Pt. 404, Subpt. P, App. 2.

credibly testified that the claimant was able to perform her past work as an account clerk."[109]  In the second, the ALJ elaborated, "In response to a hypothetical question by the Administrative Law Judge, which included the physical capacity of the claimant as described above, the vocational expert [referring to the one who testified in the first hearing] responded that she could perform her past relevant work as an accounting clerk."[110]  Neither of the ALJ's statements is true.

The hearing transcripts demonstrate that neither the vocational expert at the first hearing nor the one at the second offered any such testimony.[111]  At the first hearing the ALJ only asked the vocational expert to rate Plaintiff's past relevant work.[112]  The ALJ posed no hypothetical questions concerning a person's ability to perform work as an accounting clerk despite an RFC for sedentary work compromised by the inability to crawl, the limited ability to bend and to squat, and the need for an assistive device to ambulate.  At the second hearing, the vocational expert provided no testimony whatsoever.  The ALJ asked the second vocational expert nothing.

Absent any evidence of vocational testimony upon which the ALJ

---

[109]    Tr. 19.

[110]    Tr. 547.

[111]    See Tr. 25-51, 779-801.

[112]    See Tr. 48-50.

20

could have relied to find that Plaintiff was capable of performing her past relevant work, the decision contains no basis for that conclusion. <u>Cf.</u> 20 C.F.R. § 404.1560(b)(2)(explaining that the Commissioner may use the services of vocational experts or other resources, such as the Dictionary of Occupational Titles, to obtain evidence necessary to determine whether a claimant can do past relevant work). The ALJ does not indicate that he based the determination on some other evidence in the record or somehow took administrative notice of Plaintiff's ability to perform her past relevant work. The court is in no position to guess. Thus, the ALJ's decision is not supported by substantial evidence and must be reversed as to the finding of "not disabled" at step four.

Plaintiff would have the court continue the analysis at step five and find Plaintiff disabled pursuant to the Guidelines. The Guidelines are used at step five in place of vocational expert testimony to evaluate whether work exists for a claimant. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00. Their use is limited to situations in which the evidence of disability coincides exactly with the criteria of a particular rule within the Guidelines. <u>See</u> <u>Bowling</u>, 36 F.3d at 435. In support of her position, Plaintiff points to one of the rules that directs a finding of "disabled" for a person who is fifty to fifty-four years old, is capable of only sedentary work, and has a high school education with no transferable skills. 20 C.F.R. Pt. 404, Subpt. P, App. 2, §

201.14.  A companion rule, however, directs a conclusion of "not disabled" if such a claimant has transferable skills.  Id. at § 201.15.

In this case, the record contains no evidence on the transferability of Plaintiff's skills.  The ALJ solicited no information from a vocational expert at either hearing about transferable skills.  Typically an issue addressed by the vocational expert, it is not something that the court can determine on appeal.  More evidence is needed to determine whether Plaintiff was capable of performing either her past relevant work or other work available in significant numbers in the national economy.

### IV.   Conclusion

Based on the foregoing, the court **DENIES** Defendant's summary judgment motion and **GRANTS** Plaintiff's summary judgment motion. The case is remanded to the Commissioner for additional vocational testimony regarding Plaintiff's ability, despite her limitations, to perform her past relevant work or other work.[113]

**SIGNED** in Houston, Texas, this 27th day of April, 2006.

Nancy K. Johnson
United States Magistrate Judge

---

[113]   The court has considered Plaintiff's remaining arguments and finds no other error with the decision of the ALJ.

22